UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

JENNIFER K. HARBURY, on her own behalf
and as administratrix of the Estate of Efrain
Bamaca-Velasquez,

　　Plaintiff,

　　v.

MICHAEL V. HAYDEN, Director of the
Central Intelligence Agency, *et al.*,

　　Defendants.

Civil Action No. 96-438 (CKK)

---

**MEMORANDUM OPINION**
(August 1, 2006)

　　Plaintiff Jennifer K. Harbury brought this action on her own behalf and as administratrix of

the estate of her deceased husband, Efrain Bamaca-Velasquez ("Bamaca"), on March 7, 1996

against the Central Intelligence Agency ("CIA"), the Department of State ("State"), and the

National Security Council ("NSC"), as well as numerous named individual employees within each

of those agencies.  Plaintiff's Complaint, as amended, included twenty-eight (28) counts alleging

violations variously of constitutional law, international law, and common law arising from the

alleged imprisonment, torture, and death in Guatemala of her husband, a guerilla rebel leader in the

Guatemalan resistance movement in the early 1990s.  *See* Pl.'s Second Am. Compl. ¶¶ 103-244.[1]

Following a series of opinions by this Court, the United States Court of Appeals for the District of

Columbia Circuit, and the Supreme Court, six counts in Plaintiff's Second Amended Complaint

---

[1] The lead named defendant in Plaintiff's Second Amended Complaint is John M. Deutch,
former Director of the CIA who headed the agency from 1995-1996.  Pursuant to Rule 25(d)(1) of
the Federal Rules of Civil Procedure, the Court substitutes Michael V. Hayden, the current Director
of the CIA, as the named defendant.

remain viable – Counts 18-19 (intentional infliction of emotional distress), Counts 20-22 (negligent supervision), and Count 28 (emotional distress/loss of companionship).

Currently before the Court is Defendant's Motion to Dismiss All Remaining Counts of the Complaint Pursuant to Federal Rule of Civil Procedure 12(h)(3) (hereinafter, "Defendant's Motion to Dismiss"), which contends that this Court lacks subject matter jurisdiction over Plaintiff's action following the Supreme Court's decision in *Sosa v. Alvarez-Machain*, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004) – a ruling that held that the Federal Tort Claims Act's ("FTCA") "foreign country exception," *see* 28 U.S.C. § 2680(k), "bars all claims based on any injury suffered in a foreign country regardless of where the tortious act or omission occurred." *Sosa*, 542 U.S. at 712, 124 S.Ct. 2739. Upon a searching examination of Defendant's motion, Plaintiff's Opposition, Defendant's Reply, Plaintiff's Surreply, Defendant's Surrebuttal, the relevant case law, and the entire record herein, the Court shall grant Defendant's Motion to Dismiss and shall dismiss all counts remaining in Plaintiff's action for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).

## I: BACKGROUND

Given that the basic facts and allegations of this case have been fleshed out in great detail in previous decisions relating to this case, *see, e.g.*, *Christopher v. Harbury*, 536 U.S. 403, 406-410, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002), the Court shall only briefly summarize the relevant background in this Memorandum Opinion.[2] Plaintiff Jennifer K. Harbury, a United States citizen, is the widow of Efrain Bamaca-Velasquez, a Guatemalan citizen and rebel leader in the Guatemalan

---

[2] Given that the Court is reviewing a motion to dismiss, the Court shall accept Plaintiff's factual allegations and take them in the light most favorable to her. *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993).

National Revolutionary Union ("U.R.N.G.") who vanished in his own country in March 1992. *See* Pl.'s Second Am. Compl. ¶¶ 9, 33-34. According to Plaintiff's allegations, Bamaca was captured by Guatemalan army forces, including officers who were trained in the United States and paid/used as informants by the CIA. *Id*. ¶¶ 35-42, 46-47. Bamaca was then summarily executed on orders of the same Guatemalan officers affiliated with the CIA, *id*. ¶¶ 48-49, sometime before September 1993, *id*. ¶¶ 66, 84.

Plaintiff asserts that the CIA knew as early as March 18, 1992 that the Guatemalan army had captured Bamaca alive and shared this information with both the White House and the State Department. *Id*. ¶ 35. However, when Plaintiff sought aid from the State Department in the search for her husband, officials therein "intentionally misled" Plaintiff, by "deceptive statements and omissions, into believing that concrete information about her husband's fate did not exist because they did not want to threaten their ability to obtain information from Mr. Bamaca through his detention and torture." *Id*. ¶ 67. Throughout the period stretching from 1992 through 1995, Plaintiff was in frequent contact with the State Department, seeking to gain any information relating to her husband and participating in various hunger strikes to focus public attention on the issue. *Id*. ¶¶ 56-68, 70-71, 75, 80, 83. Plaintiff finally learned of her husband's death in March 1995 – nearly one and a half years after his apparent passing – when a congressman publicly announced that Bamaca had been killed on the orders of a Guatemalan army colonel who was also a paid contractor of the CIA. *Id*. ¶ 91.

A year later, in March 1996, Plaintiff brought the present suit before this Court against the CIA, the State Department, the NSC, and various members of each agency in their official and individual capacities. *See generally* Compl. Plaintiff's Second Amended Complaint, which is currently the controlling document in this case, listed twenty-eight (28) causes-of-action under

federal, state, and international law.  Following a series of decisions, such as this Court's March 23, 1999 Memorandum Opinion and Order, *see Harbury v. Deutch*, No. 96-00438 (CKK), 1999 WL 33456919 (D.D.C. Mar. 23, 1999), *aff'd in part, rev'd in part*, 233 F.3d 596 (D.C. Cir. 2000), *aff'd* 536 U.S. 403, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002) (affirming the district court opinion in full, reversing the D.C. Circuit's reversal-in-part), and this Court's March 9, 2000 Memorandum Opinion and Order, *see Harbury v. Deutch*, Civ. No. 96-438 (D.D.C. Mar. 9, 2000), only six (6) counts remain presently viable in this case – Counts 18-22, and Count 28.  These remaining counts may be grouped into two major categories.  First, Plaintiff has alleged common law torts invoking the Federal Tort Claims Act, 28 U.S.C. §§ 2401(b) and 2675, (1) on behalf of herself and her husband's estate against the CIA defendants for intentional infliction of emotional distress by causing and conspiring to cause Bamaca's imprisonment, torture, and execution, *see* Pl.'s Second Am. Compl. ¶¶ 196-201 (Counts 18-19); and (2) on behalf of her husband's estate against the CIA defendants for negligent supervision resulting in his false imprisonment, assault and battery, and wrongful death, *id.* ¶¶ 202-216 (Counts 20-22).  Second, Plaintiff has bought a tort claim said to arise under "international law, including the law of war" against the CIA defendants on behalf of herself and her husband's estate, *id.* ¶¶ 241-244 (Count 28).  Given concerns regarding the scope and clarity of Count 28, the Court ordered and Plaintiff provided a "Submission of a More Detailed Statement Regarding Count 28 of Her Complaint" on April 19, 1999.  *See* Pl.'s Submission of Detailed Stmt. re: Count 28 at 1-7.

Importantly, on March 31, 2000, the Attorney General certified that the seventeen (17) individually-sued federal defendants were acting within the scope of their employment with respect to the incidents alleged in Plaintiff's Second Amended Complaint.  *See* Cert. of Mark E. Nagle on

behalf of the Attn'y Gen., *attached to* Defs.' Suppl. Mot. to Dismiss (Apr. 3, 2000).  By operation

of 28 U.S.C. § 2679(d)(4), the so-called Westfall Act, Plaintiff's action became one against the

United States as the sole party defendant.  Pursuant to 28 U.S.C. § 2679(b)(1) ("exclusiveness of

remedy"), Plaintiff's action – from that point forward – became governed exclusively by the FTCA,

including the limitations and exceptions to the waiver of sovereign immunity set forth in that

statutory scheme.

　　　　Concurrent with the Attorney General's certification, Defendant filed a supplemental motion

to dismiss in this case.  Through a Memorandum Opinion and Order dated March 13, 2001, this

Court denied without prejudice the Government's supplemental motion seeking dismissal on the

basis of the discretionary function and independent contractor exceptions to the FTCA, and denied

without prejudice the Government's motion seeking dismissal on the basis of the political question

doctrine and the "foreign country exception" to the FTCA, 28 U.S.C. § 2680(k) (excepting from

FTCA jurisdiction "[a]ny claim arising in a foreign country").  *See Harbury v. Deutch*, Civ. No.

96-438 (CKK) (D.D.C. Mar. 13, 2001) (memorandum opinion and order denying Government's

supplemental motion to dismiss).  In rejecting the "foreign country exception" as the basis for

dismissal, the Court relied on the D.C. Circuit's decision in *Sami v. United States*, 617 F.2d 755

(D.C. Cir. 1979), emphasizing that "the United States enjoys no exemption from liability 'for acts or

omissions occurring here which have their operative effect in another country.'" *Id.* at 17 (quoting

*Sami*, 617 F.2d at 762).  Pursuant to *Sami*, which was then controlling precedent, the Court

therefore found that "to the extent Harbury alleges tortious acts which occurred in the United States,

though their effect might have been felt in Guatemala, these are not covered by the foreign country

exception." *Id.*; *see also id.* at 17 n.11 (noting that the "foreign country exception" also does not

bar "those acts occurring here which [Harbury] alleges took effect here, such as the acts allegedly

occasioning her claim of intentional infliction of emotional distress").

The United States Supreme Court in *Sosa v. Alvarez-Machain*, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004), issued on June 29, 2004, specifically rejected the "headquarters doctrine" established in *Sami*, *see id.* at 701, 124 S.Ct. 2739 (explicitly abrogating *Sami*), under the theory that such a doctrine "threatens to swallow the foreign country exception whole, certainly at the pleading stage," *id.* at 703, 124 S.Ct. 2739. Following an analysis of the language and legislative history of the FTCA's "foreign country exception," the *Sosa* Court laid down the basic rule that "the FTCA's foreign country exception bars all claims based on any injury suffered in a foreign country, regardless of where the tortious act or omission occurred." *Id.* at 711, 124 S.Ct. 2739. Given the abrogation of *Sami* in the wake of *Sosa* and the apparent tenuousness of this Court's March 13, 2001 Memorandum Opinion and Order, Defendant has filed a Motion to Dismiss All Remaining Counts of the Complaint Pursuant to Federal Rule of Civil Procedure 12(h)(3). Defendant's motion contends, in short, "[b]ecause *Sosa* eliminates from the jurisdictional reach of the FTCA all claims based on harm occurring in a foreign country, there is no subject matter jurisdiction over this action and the action must be dismissed as a matter of law." Def.'s Mot. to Dismiss at 5.

## II: LEGAL STANDARDS

Defendant brings this motion pursuant to Federal Rule of Civil Procedure 12(h)(3), which provides: "Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction over the subject matter, the court shall dismiss the action." Fed. R. Civ. P. 12(h)(3). However, Rule 12(h)(3) merely clarifies that lack of subject matter jurisdiction is a defense that is never waived and that, if such jurisdiction is lacking, the appropriate disposition is dismissal. *See* 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1347, at 49 (3d

6

ed. 2004).  When faced with what a party characterizes as a Rule 12(h)(3) motion, a court should

treat the motion as a traditional Rule 12(b)(1) motion for lack of subject matter jurisdiction.  *See*

*Haase v. Sessions*, 835 F.2d 902, 905-06 (D.C. Cir. 1987) (citing *Bender v. Williamsport Area*

*Sch. Dist.*, 475 U.S. 534, 541, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986)); *see also United States ex*

*rel. El-Amin v. George Washington Univ.*, No. Civ. A 95-2000 (JGP), 2005 WL 485971, at *3

(D.D.C. Feb. 25, 2005).

   A court must dismiss a case when it lacks subject matter jurisdiction pursuant to Rule

12(b)(1).  In general, a motion to dismiss under Federal Rule of Civil Procedure 12(b) should not

prevail "unless plaintiffs can prove no set of facts in support of their claim that would entitle them to

relief."  *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994) (citing *Conley v.*

*Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).  A court may appropriately dispose

of a case under 12(b)(1) for standing, and may "consider the complaint supplemented by undisputed

facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's

resolution of disputed facts."  *Coalition for Underground Expansion v. Mineta*, 333 F.3d 193, 198

(D.C. Cir. 2003) (citations omitted); *see also Artis v. Greenspan*, 223 F. Supp. 2d 139, 152 n.1

(D.D.C. 2002) ("A court may consider material outside of the pleadings in ruling on a motion to

dismiss for lack of venue, personal jurisdiction or subject matter jurisdiction."); *Vanover v.*

*Hantman*, 77 F. Supp. 2d 91, 98 (D.D.C. 1999) ("where a document is referred to in the complaint

and is central to plaintiff's claim, such a document attached to the motion papers may be considered

without converting the motion to one for summary judgment") (citing *Greenberg v. The Life Ins.*

*Co. of Virginia*, 177 F.3d 507, 515 (6th Cir. 1999)).  At the stage in litigation when dismissal is

sought, the plaintiff's complaint must be construed liberally, and the plaintiff should receive the

benefit of all favorable inferences that can be drawn from the alleged facts. *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997). In spite of the favorable inferences that a plaintiff receives on a motion to dismiss, it remains the plaintiff's burden to prove subject matter jurisdiction by a preponderance of the evidence. *Am. Farm Bureau v. Envtl. Prot. Agency*, 121 F. Supp. 2d 84, 90 (D.D.C. 2000).

### III: DISCUSSION

In response to Defendant's Motion to Dismiss and its reliance upon the *Sosa* decision, Plaintiff agrees that "the *Sosa* ruling applies . . . to tort claims for which the United States may lawfully substitute itself for individually named defendants" and "to claims based on harms occurring outside United States territory." Pl.'s Opp'n at 1. Indeed, based on *Sosa*'s mandate that a federal court may not maintain jurisdiction over FTCA claims based on injury arising in a foreign country, Plaintiff appears to implicitly concede that all common law claims brought on behalf of her husband, Bamaca, must fail.[3]

However, Plaintiff takes a two-pronged approach in maintaining that at least some of her claims remain viable. First, Plaintiff argues that the Attorney General's March 31, 2000 Westfall certification was improper. *See* Pl.'s Opp'n at 2-11. Rather, given the "extraordinary nature" of a claim of torture, Plaintiff asserts that the acts of the individual defendants at issue were *ultra vires*; as such, it was inappropriate for the Government to assert that those actions could have fallen within the scope of the defendants' employment. *See id.* Because the United States could not properly be

---

[3] *See, e.g., id.* ("Plaintiff . . . urges that *her* claims for violations of intentional law . . . are not and cannot be barred by this ruling; and that *her* claim for infliction of emotional distress upon *her* survives as well") (emphasis added); Pl.'s Surreply at 1 ("Plaintiff would show that the Defendants' responsive arguments regarding *her* international law claims and *her* claims for emotional distress must fail . . . .") (emphasis added).

substituted as the sole defendant, the FTCA and its inherent limitations – as set forth in *Sosa* – do not apply to Plaintiff's situation. *See id.* Second, irrespective of the Westfall issue, Plaintiff contends that (1) her claims under international law – which she now designates as claims under the Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1350, and the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350 Note, *see* Pl.'s Opp'n at 1 – and (2) claims alleging her own personal distress, suffered within the borders of the United States, survive the Supreme Court's *Sosa* decision. *See* Pl.'s Opp'n at 1; Pl.'s Surreply at 1. Upon a closer inspection, each of Plaintiff's arguments is without merit.

  A. *The Propriety of the Westfall Certification in This Action*

  Plaintiff first attempts to escape the Supreme Court's FTCA-related mandate in *Sosa*, which eliminated the "headquarters doctrine" and substantially bolstered the "foreign country exception," by making an end-run around the FTCA itself. That is, Plaintiff now contends that the Attorney General's March 31, 2000 Westfall certification in this case – substituting the Government for all individual defendants – was improper. Without the Government as the sole defendant, the FTCA would not be applicable to Plaintiff's case, and *Sosa* would no longer exist as a bar to the claims set forth in her Second Amended Complaint. In order to fully examine the merits of Plaintiff's challenge, the Court shall first review the history and parameters of the Westfall certification process, and then shall turn to an analysis of Plaintiff's specific challenge.

  1. History/Parameters of the Westfall Certification Process

  Following the Supreme Court's decision in *Westfall v. Erwin*, 484 U.S. 292, 108 S.Ct. 580, 98 L.Ed.2d 619 (1988), Congress enacted the Federal Employees Liability Reform and Tort Compensation Act of 1988 ("Westfall Act"), Pub. L. No. 100-694, 102 Stat. 4563 (codified at 28

U.S.C. §§ 2671, 2674, 2679).  In *Westfall*, the Supreme Court held that while federal officials

generally enjoy absolute immunity from state tort lawsuits for money damages, that immunity is

dependent on whether their conduct was both within the scope of employment and discretionary in

nature.  *See Westfall*, 484 U.S. at 299, 108 S.Ct. 580.  The Westfall Act eliminates the

"discretionary" requirement and provides that federal employees' immunity from state tort lawsuits

hinges exclusively on whether they were acting within the scope of employment during the alleged

incident.  *See* 28 U.S.C. § 2679(b)(1); *United States v. Smith*, 499 U.S. 160, 163, 111 S.Ct. 1180,

113 L.Ed.2d 134 (1991); *Haddon v. United States*, 68 F.3d 1420, 1422-23 (D.C. Cir. 1995).

Under the Westfall Act, an Attorney General or designee who believes that a federal

employee was acting within the scope of employment at the time of the alleged incident may issue a

certification to that effect.  *See* 28 U.S.C. § 2679(d)(2) (certification by Attorney General); 28

C.F.R. § 15.3 (certification by designee); *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 419,

115 S.Ct. 2227, 132 L.Ed.2d 375 (1995).  A Westfall certification has two immediate consequences

for a case already in federal court:  (1) it requires the substitution of the United States for the federal

employee(s) as the defendant(s) in the lawsuit; and (2) it converts the lawsuit into an action against

the United States under the FTCA.  *See* 28 U.S.C. § 2679(d)(2); *Smith*, 499 U.S. at 161-62, 111

S.C. 1180.  However, while a Westfall certification is conclusive for the purposes of removal, *see*

28 U.S.C. § 2679(d)(2), such a certification is *not* conclusive regarding the substitution of the

federal government.  *See Lamagno*, 515 U.S. at 431-35, 115 S.Ct. 2227.  That is, upon challenge or

a *sua sponte* inquiry, the federal court may determine independently whether the employee acted

within the scope of employment and, therefore, whether to substitute the federal government as the

proper defendant.  *Id.*; *see also Haddon*, 68 F.3d at 1423; *Kimbro v. Velten*, 30 F.3d 1501, 1505

(D.C. Cir. 1994), *cert. denied*, 515 U.S. 1145, 115 S.Ct. 2584, 132 L.Ed.2d 833 (1995).  Upon a

challenge, the plaintiff bears the burden of producing evidence that a defendant was acting outside

the scope of his employment to defeat the "*prima facie*" effect of a Westfall certification.  *See*

*Kimbro*, 30 F.3d at 1509 (citing *Melo v. Hafer*, 13 F.3d 736, 747 (3d Cir. 1994)); *Stokes v. Cross*,

327 F.3d 1210, 1215 (D.C. Cir. 2003); *Schneider v. Kissinger*, 310 F. Supp. 2d 251, 264 (D.D.C.

2004), *aff'd on other grounds*, 412 F.3d 190 (D.C. Cir. 2005), *cert. denied*, 126 S.Ct. 1768, 164

L.Ed.2d 515 (2006); *Wright v. United States*, No. 95-0274, 1996 U.S. Dist. LEXIS 1781, at *8

(D.D.C. Feb. 8, 1996).

If the reviewing court determines that the employee acted *within* the scope of official duties,

the employee becomes absolutely immune from actions for money damages arising from the same

incident; the plaintiff's only recourse is to proceed against the federal government under the FTCA.

*See* 28 U.S.C. § 2679(b)(1); *Lamagno*, 515 U.S. at 425-29, 115 S.Ct. 2227; *Haddon*, 68 F.3d at

1423.  If, however, the reviewing court determines that the employee acted *outside* the scope of

employment, the court must re-substitute the federal employee as the defendant.  *Id.*

2.      Plaintiff's Present Challenge to the March 31, 2000 Westfall Certification

Plaintiff, in her Opposition and Surreply to Defendant's Motion to Dismiss, now attempts to

challenge the March 31, 2000 Westfall certification in this case.  *See* Pl.'s Opp'n at 2-11; Pl.'s

Surreply at 1-10.  Specifically, Plaintiff claims

> that any acts of direct conspiracy, involvement, and participation in torture, as
> alleged in her complaint, would fall far outside the scope of the CIA's grant of
> authority from the United States Congress.  In turn, under well settled law, such
> actions are automatically *ultra vires*, and can never be attributed to the government.
> They are, de facto, beyond the agency's power or jurisdiction.  Thus the defendant
> officials cannot claim any sovereign immunity, and must face any and all legal
> consequences in their individual capacities.

Pl.'s Surreply at 2 (citing *Dugan v. Rank*, 372 U.S. 609, 621-23, 83 S.Ct. 999, 10 L.Ed.2d 15

(1963); *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed.

1628 (1949)).  Plaintiff then cites a portion of the legislative history of the FTCA itself to support

this interpretation, noting that the House Report states that the legislation was intended to provide

> that the United States will incur various liability only for the common law torts of its
> employees which are committed within the "scope of their employment."  If an
> employee is accused of egregious misconduct, rather than mere negligence or poor
> judgment, then the United States may not be substituted as the defendant, and the
> individual employee remains liable.

*Id.* at 4 (citing H.R. Rep. No. 700, 100th Cong., 2d Sess., *reprinted in* 1988 U.S.C.C.A.N. 5945,

5949).  As such, because the tortious act alleged as the basis of her claims – i.e., torture – "exceed[s]

the limits of the agency' [sic] statutory delegation of power" and is so illegal as to be beyond any

statutory authorization, Plaintiff claims that the Government may not properly substitute itself

pursuant to the Westfall Act; that is, the individual defendants were clearly exceeding the scope of

their employment in a manner that cannot be attributed to the Government and covered by the

FTCA, and these defendants must remain in this suit.  *See* Pl.'s Opp'n at 2, 4, 5.

    As discussed below, two fundamental problems undermine Plaintiff's challenge to the March

31, 2000 Westfall certification in this case.  First, Plaintiff's present challenge to the certification is

now prejudicially untimely.  Second, even assuming *arguendo* that such a challenge was timely and

could be considered on the merits, Plaintiff misapprehends the relevant "scope-of-employment" test

for the Westfall Act/FTCA.  An application of the correct test, under the required examination, leads

to one inexorable conclusion:  the individual defendants were acting within the scope of their

employment in undertaking the alleged, tortious actions and substitution was therefore proper.

Accordingly, Plaintiff's Westfall Act challenge must be rejected, the FTCA applied, and a *Sosa*-

related impact analysis undertaken.

a.      *Plaintiff's Westfall Challenge is Prejudically Untimely*

As a preliminary matter, Plaintiff's present Westfall Act certification challenge, raised in her

present Opposition, is prejudicially untimely.  In response to this issue, Plaintiff refers to pages 7-11

of her Opposition to Defendant's Supplemental Motion to Dismiss, filed on May 12, 2000.  Plaintiff

contends that a review of this filing establishes that "Plaintiff challenged the substitution of the

United States for the CIA Defendants" almost immediately after that substitution was made, and,

therefore, this "renewed" challenge cannot be prejudicially untimely as a matter of law.  *See* Pl.'s

Opp'n at 2 & n.4.  Importantly, Plaintiff now expressly admits that "substitution into the claims for

negligent supervision was not challenged by the Plaintiff," Pl.'s Surreply at 7 – an admission that

seems to indicate that Counts 20-22 of her Second Amended Complaint (her claims for negligent

supervision) are no longer viable, as the Government is therefore now the sole defendant as to these

claims, the FTCA applies, and *Sosa*'s interpretation on the "foreign country exception" takes hold.

However, Plaintiff continues to maintain that her May 12, 2000 Opposition brief did call

into question "substitution into the claims for direct participation in and conspiracy to commit

torture."  *See* Pl.'s Surreply at 7 (noting that her previous brief argued, "'[t]o the extent that the

government has purported to substitute the United States for the individual defendants with respect

to the international law claims, that attempt fails'") (quoting Pl.'s Opp'n to Def.'s Suppl. Mot. to

Dismiss at 7).[4]  A review of the actual filing in question undermines Plaintiff's bold assertion that

she previously challenged the validity of the Attorney General's March 31, 2000 Westfall

certification.  It is noteworthy that nowhere in her Opposition brief did Plaintiff challenge the *scope*

---

[4] Plaintiff, in a footnote in her May 12, 2000 Opposition, also noted that the Westfall
certification was subject to judicial review, *see* Pl.'s Opp'n to Def.'s Suppl. Mot. to Dismiss at 7-8
n.9, a fact which is without contest and without particular relevance to the timeliness issue.

of the Attorney General's certification – i.e., whether the individual defendants were acting within the scope of their employment and could, as an initial matter, actually be substituted out of the case. *See id.* (Plaintiff, in her Surreply, basically concedes that she never previously made a scope of delegation challenge, admitting that "[t]he broader question of Congressional delegation and the scope of CIA authority was unnecessary at the time, in light of the case law then").  Rather, it is clear that in her May 12, 2000 Opposition, Plaintiff simply challenged the legal operation of the Westfall certification to have substituted the United States for the individually-named defendants as to Plaintiff's Count 28 claims under the ATCA and TVPA.  *See* Pl.'s Opp'n to Def.'s Suppl. Mot. to Dismiss at 7-11.  Such a challenge rested, not on the validity of the Attorney General's Westfall certification, but on the construction of 28 U.S.C. § 2679(b)(2)(B), which exempts from Westfall substitution claims brought "for a violation of a statute of the United States under which such action against an individual is otherwise authorized."  As such, Plaintiff's present gloss is specious:  her reasoning is based on a failure to distinguish between a challenge to the validity of a Westfall certification (i.e., Did the Attorney General rely on the proper legal criteria in rendering the scope-of-employment determination?) and a challenge to the legal operation of that valid certification (i.e., For which claims can the United States be substituted for the individual federal defendants?).  A plain review of the totality of Plaintiff's May 12, 2000 challenge indicates that Defendant was never, until now, placed on notice that Plaintiff was challenging the *validity* of the certification itself.

This time lapse – over four (4) years between the Westfall certification and Plaintiff's present challenge – is significant.  Like the defenses of absolute and qualified immunity available to employees under a *Bivens* action, the Westfall Act confers essentially "an immunity from suit rather than a mere defense to liability" that, like the *Bivens*-related immunity, "is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86

L.Ed.2d 411 (1985); *see also Kimbro*, 30 F.3d at 1504 (relying upon *Mitchell*'s reasoning to hold

that a pre-trial denial of Westfall Act protection is an immediately appealable final decision).

Indeed, this Court noted in its March 23, 1999 Memorandum Opinion (anticipating the

Government's Westfall certification), that upon forthcoming certification, "the United States will

automatically be substituted for the individual defendants." *Harbury*, 1999 WL 33456919 at *14

(citing 28 U.S.C. § 2679(d)(1)).  Since April of 2000, the individually-named federal defendants

and their counsel have been operating on the basis that they are no longer defendants in this action.

For the Court to entertain Plaintiff's new challenge to the scope of the Westfall certification after all

of these years, and to do so based on an argument that was available – but not raised – by Plaintiff

when the certification was initially filed, would be prejudicial indeed.  Accordingly, the blatant

untimeliness of Plaintiff's challenge argues in favor of a rejection of her Westfall argument.

> b. *The Proper Scope-of-Employment Test*

Even assuming *arguendo* that Plaintiff's Westfall challenge was timely, a review of the

merits of Plaintiff's argument reveals that her contentions are plainly in error.  As noted above, the

basic thrust of Plaintiff's argument is that violations of international norms, such as crimes involving

torture and execution, cannot be the kinds of acts that Executive Branch officials are employed to

perform; because these acts fall outside of the scope of employment, substitution of the Government

via a Westfall certification is *de facto* improper.  In order to analyze the persuasiveness of Plaintiff's

argument, it is first necessary to locate and set forth the relevant "scope-of-employment" test.

To determine whether a federal employee was acting within the scope of his or her

employment, a federal court must apply the law of the state where the tortious act occurred.  *See*

*Tarpeh-Doe v. United States*, 28 F.3d 120, 123 (D.C. Cir. 1994); *Garber v. United States*, 578

F.2d 414, 415 (D.C. Cir. 1978).  Given that the critical decisions, employee instructions, and job

assignments, as alleged by Plaintiff, emanated from the CIA (located in Langley, Virginia), the State

Department (located in Washington, D.C.), and the NSC (located in Washington, D.C.), the Court

must apply both Virginia and District of Columbia law in determining the proper framework under

which to analyze scope-of-employment issues.  Both jurisdictions look to the Restatement (Second)

of Agency as the proper framework for determining whether an employee acted within the scope-of-

employment.  *See Haddon*, 68 F.3d at 1423-24; *Rasul v. Rumsfeld*, 414 F. Supp. 2d 26, 32

(D.D.C. 2006); *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1351 (4th Cir. 1995); *Newport*

*News Indus. v. Dynamic Testing, Inc.*, 130 F. Supp. 2d 745, 749-50 (E.D.Va. 2001).  The

Restatement provides:

> [c]onduct of a servant is within the scope of employment if, but only if:  (1) it is of
> the kind he is employed to perform; (2) it occurs substantially within the authorized
> time and space limits; (3) it is actuated, at least in part, by a purpose to serve the
> master; and (4) if force is intentionally used by the servant against another, the use of
> force is not unexpected by the master.

Restatement (Second) of Agency § 228 (1958).

As a threshold matter, Plaintiff argues that this scope-of-employment test is fundamentally

inapplicable to this situation, *see* Pl.'s Surreply at 4, as torture is clearly in violation of, *inter alia*,

the Fourth Hague Convention, the Geneva Convention, the Universal Declaration of Human Rights,

the International Covenant on Civil and Political Rights, the Convention Against Torture, the

Torture Victim Protection Act, and the CIA's own mandate, *see* Pl.'s Opp'n at 7-10.  Such an

argument is unavailing for three reasons.  *See Rasul*, 414 F. Supp. 2d at 32 n.5.  First, in a passage

overlooked by Plaintiff, Congress, through the FTCA, established a framework where state law, not

State Department representations to the United Nations or international treaties, governs the scope-

of-employment determination.  *See* H.R. Rep. No. 700, 100th Cong., 2d Sess., *reprinted in* 1988

U.S.C.C.A.N. 5945, 5949 ("Under the FTCA, the issue of whether an employee was acting within

the scope of his employment is governed by the law of the state in which the negligent or wrongful

conduct occurred."). Second, to the extent that the Executive Branch can make legal representations

to this Court regarding the scope of an employee's conduct, the Government has done so through its

March 31, 2000 Westfall certification. *See Lamagno*, 515 U.S. at 434, 115 S.Ct. 2227. Third, and

finally, "[d]efining an employee's scope of employment is not a judgment about whether alleged

conduct is deleterious or actionable; rather, this procedure merely determines *who* may be held

liable for that conduct, an employee or his boss." *Schneider*, 310 F. Supp. 2d at 265 (emphasis in

original); *Rasul*, 414 F. Supp. 2d at 32 n.5; *cf. Ramey v. Bowsher*, 915 F.2d 731, 734 (D.C. Cir.

1990) ("We reject appellant's argument that the tortious acts are unlawful *per se* and therefore

cannot be considered [] within the outer limits of the official's duties."); *Martin v. D.C. Metro.

Police Dep't*, 812 F.2d 1425, 1429 (D.C. Cir. 1987) ("No government officer, of course, can be

'authorized' to act unlawfully. But if the scope of an official's authority or line of duty were viewed

as coextensive with the official's lawful conduct, then immunity would be available only where it is

not needed; in effect, the immunity doctrine would be 'completely abrogate[d].'") (citation omitted).

Accordingly, as long-established within this Circuit, *see Haddon*, 68 F.3d at 1423-24; *Kimbro*, 30

F.3d at 1506, the Court shall apply the principles set forth in the Restatement (Second) of Agency to

determine whether the acts alleged in Plaintiff's Second Amended Complaint fall within the scope of

the individual defendants' employment, thereby allowing Westfall certification and the application

of the FTCA.

        c.    *Application of the Scope-of-Employment Test*

        Pursuant to the applicable scope-of-employment test, the Court shall look at (1) the nature of

the conduct at issue; (2) space and time limitations; (3) the purpose of the conduct; and (4) the

foreseeability of the conduct to determine whether the Government's March 31, 2000 Westfall

certification and contemporaneous substitution was proper in this case. *See* Restatement (Second) of Agency § 228 (1958). Because Plaintiff does not challenge the conduct based on whether it took place within the space and time limitations authorized by the employer, the Court shall first set forth the standards governing the nature and foreseeability of the conduct at issue (thereby melding criteria #1 and #4, as seems logical under the test) and then outline the standards governing the purpose of the conduct at issue. *See Weinberg v. Johnson*, 518 A.2d 985, 991 (D.C. 1986) (essentially making the inquiry two-part, the first prong looking at whether the employee was at least partially motivated to further the employer's interests, and the second prong focusing on whether the employees conduct was "of the kind he was employed to perform"). Once the relevant criteria have been outlined, the Court shall then analyze the actions alleged in Plaintiff's Second Amended Complaint in light of the governing benchmarks. An analysis of these principles in light of the facts alleged in Plaintiff's Second Amended Complaint reveals that the Government's action in moving forward with the March 31, 2000 Westfall certification was entirely proper.

i.     Nature of the Conduct/Foreseeability

To qualify as conduct of the kind within the scope of one's employment, the conduct must either have been "of the same general nature as that authorized" or "incidental to the conduct authorized." Restatement (Second) of Agency § 229 (1958); *Haddon*, 68 F.3d at 1424. The District of Columbia "liberally construes the doctrine of respondeat superior . . . with respect to the first prong of the Restatement (Second) of Agency § 228(1)." *Stokes*, 327 F.3d at 1216 (citing *Haddon*, 68 F.3d at 1425-26; *Weinberg*, 518 A.2d at 988-90).

> [C]onduct is "incidental" to an employee's legitimate duties if it is "foreseeable." "Foreseeable" in this context does not carry the same meaning as it does in negligence cases; rather, it requires the court to determine whether it is fair to charge employers with responsibility for the intentional torts of their employees. To be foreseeable, the torts must be "a direct outgrowth of the employee's instructions or

18

job assignment."  It is not enough that an employee's job provides an "opportunity"
to commit an intentional tort.

*Haddon*, 68 F.3d at 1424 (citations omitted).

"The courts in the District of Columbia categorize practically any conduct as falling within
the scope of, or incidental to, that authorized by their employer so long as the action has some nexus
to the action authorized." *Rasul*, 414 F. Supp. 2d at 33.  For example, in *Lyon v. Carey*, 533 F.2d
649 (D.C. Cir. 1976), the D.C. Circuit upheld a jury verdict that a mattress deliveryman acted
within the scope of his employment when he assaulted and raped the plaintiff immediately following
a dispute over whether he should carry the mattress into the apartment for her inspection and
whether a check was an acceptable means of payment.  The *Lyon* court emphasized that "[t]he
dispute arose out of the very transaction which had brought [the deliveryman] to the premises," and
observed that the assault "arose naturally and immediately between [the deliveryman] and the
plaintiff about two items of great significance in connection with his job[:]  the request of the
plaintiff . . . to inspect the mattress and springs before payment  . . . and [the deliveryman's]
insistence on getting cash rather than a check." *Id*. at 652.  Moreover, in *Johnson v. Weinberg*, 434
A.2d 404 (D.C. 1981), the D.C. Court of Appeals similarly ruled that a laundromat could be liable
for injuries inflicted when an employee responsible for removing clothes from washing machines
shot a customer during a dispute involving missing shirts.  Because "[t]he assault arose out of the
transaction which initially brought [the customer] to the premises . . . and was triggered by a dispute
over the conduct of the employer's business," the court held that the jury could find the shooting
incidental to the employment. *Id*. at 409.  Virginia follows a similar analysis, finding actions to be
within the scope of employment so long as at least some nexus exists. *See, e.g.*, *Martin*, 48 F.3d at
1352 (company liable for assaults undertaken by its general manager where the "assaults took place

in the workplace, during working hours, on an employee whom he had authority to hire, fire, promote, and discipline" and therefore "arose out of [the manager's] management of the hotel").

As such, the relevant "inquiry is necessarily whether the intentional tort was foreseeable, or whether it was 'unexpectable in view of the duties of the servant.'" *Majano v. Kim*, No. Civ. A 04-201, 2005 WL 839546, at *8 (D.D.C. Apr. 11, 2005) (quoting Restatement (Second) of Agency § 245). "[A] broad range of intentional tortious conduct has been found to be within the scope of employment despite the violence by which injury was inflicted," *id.*, and employers may be held liable for "foreseeable altercations [that] may precipitate violence . . . even though the particular type of violence was not in itself anticipated or foreseeable," *Lyon*, 533 F.2d at 651.

           ii.     Purpose of the Conduct

In addition to looking at the nature and foreseeability of the conduct at issue, the Court must also address whether the alleged actions were perpetuated, at least in part, for the purpose of serving the master. *See* Restatement (Second) of Agency § 228. "[W]here the employee is in the course of performing job duties, the employee is presumed to be intending, at least in part, to further the employer's interests." *Weinberg*, 518 A.2d at 989 (citation omitted). The D.C. Circuit has stressed the idea that "[t]he intent criterion focuses on the underlying dispute or controversy, not on the nature of the tort, and is broad enough to embrace *any intentional tort* arising out of a dispute that 'was originally undertaken on the employer's behalf.'" *Stokes*, 327 F.3d at 1216 (quoting *Weinberg*, 518 A.2d at 992) (emphasis added). Finally, "[t]he employer does not avoid liability for the employee's intentional torts . . . if the tort is committed partially because of a personal motive, such as revenge, as long as 'the employee [is] actuated, at least in part, by a desire to serve his principal's interest.'" *Weinberg*, 518 A.2d at 988 (citing *Jordan v. Medley*, 711 F.2d 211, 214 (D.C. Cir. 1983); Restatement (Second) of Agency § 245 cmt. f (1958)).

iii.    Analysis of the Relevant Standards

Importantly, the National Security Act of 1947 provides, *inter alia*, that the Director of

Intelligence is to gather and provide all national intelligence in a manner that is "timely, objective,

independent of political considerations, and based on all sources available to the intelligence

community and other entities."  50 U.S.C. § 403-1(a)(2); *see also id.* § 403-4a(d)(1) ("The

Director of the Central Intelligence Agency shall collect intelligence through human sources and by

other appropriate means . . . .").   A review of the allegations made in Plaintiff's Second Amended

Complaint strongly supports the conclusion that the subject conduct was undertaken, not for

personal benefit, but was foreseeable action conducted for the purpose of gathering information and

intelligence from Bamaca – i.e., conduct which falls under the very mission of the CIA.  For

instance, Plaintiff, in her Second Amended Complaint, alleges, *inter alia*:

- "[P]aid CIA agents were hired by the CIA for the purpose of, among other things, obtaining information about the URNG."  Pl.'s Second Am. Compl. ¶ 43.  "[I]t was understood by the CIA that this information would be obtained through torture and similar means."  *Id.*

- "Defendants knowingly paid substantial sums to the CIA's Guatemalan agents or 'assets' who secretly imprisoned, tortured and extrajudicially murdered Mr. Bamaca in order to obtain information from Mr. Bamaca that was sought by the CIA."  *Id.* ¶ 46.

- "Defendant CIA has a long-standing policy, pattern or practice of extracting information through severe torture that often results in death, of purchasing information that the CIA knows is being extracted through torture and the threat of extrajudicial execution."  *Id.* ¶ 93.

- "Defendant CIA maintains a policy, pattern or practice of extracting information through the imprisonment and/or severe torture of individuals who may possess information that the CIA . . . may deem valuable that often results in their death."  *Id.* ¶¶ 104, 113, 126.

- "Defendant CIA maintains a policy, pattern or practice of purchasing information that its officials, employees and/or agents know or should know is being extracted through secret imprisonment, torture, and threat of extrajudicial execution of

individuals who may possess information that the CIA, CIA officials, CIA employees and/or CIA agents may deem valuable." *Id.* ¶¶ 108, 114, 131.

- "The CIA Defendants adhered to this policy, pattern or practice when they conspired with and/or directed Julio Roberto Alpirez and/or others who intentionally and secretly imprisoned, tortured and/or extrajudicially executed Mr. Bamaca as part of their effort to obtain information sought by the CIA [D]efendants." *Id.* ¶¶ 109, 132.

- "This false imprisonment of Bamaca was caused by the CIA Defendants' negligent supervision of Alpirez and/or others whom they had hired to extract information from Bamaca." *Id.* ¶¶ 205, 210.

- "The CIA Defendants should have foreseen that Bamaca might be subjected to false imprisonment because they knew or should have know that Alpirez and/or others from whom they were seeking to purchase this information would resort to such methods to obtain the information . . . ." *Id.* ¶¶ 206, 211.

- "The wrongful death of Bamaca was caused by the CIA Defendants' negligent supervision of Alpirez and/or others whom they had hired to extract information from Bamaca." *Id.* ¶ 215.

Taken as true, the allegations made by Plaintiff in her Second Amended Complaint reveals that the tortious conduct at issue – i.e., torture and extrajudicial execution – by alleged CIA agents was a direct outgrowth of their instructions or job assignment.  That is, the conduct was either "of the same general nature as that authorized," Restatement (Second) of Agency § 229, *see* Pl.'s Second Am. Compl. ¶¶ 104, 113, 126 ("Defendant CIA maintains a policy, pattern or practice of extracting information through the imprisonment and/or severe torture of individuals who may possess information that the CIA . . . may deem valuable that often results in their death."), or was, at the very least, "incidental to the conduct authorized," Restatement (Second) of Agency § 229 – i.e., the collection of intelligence from human sources, *see* Pl.'s Second Am. Compl. ¶ 46 ("Defendants knowingly paid substantial sums to the CIA's Guatemalan agents or 'assets' who secretly imprisoned, tortured and extrajudicially murdered Mr. Bamaca in order to obtain information from Mr. Bamaca that was sought by the CIA.").  The fact that torture could be used

and/or an extrajudicial execution employed was clearly foreseeable, according to Plaintiff herself. *See id.* ¶¶ 206, 211 ("The CIA Defendants should have foreseen that Bamaca might be subjected to false imprisonment because they knew or should have know that Alpirez and/or others from whom they were seeking to purchase this information would resort to such methods to obtain the information . . . .").

Moreover, Plaintiff's allegations of torture and extrajudicial execution, though clearly reprehensible, do not offset the presumption that the former individual defendants were acting on behalf of their employer(s) during "the course of performing job duties." *Weinberg*, 518 A.2d at 989; *see* Pl.'s Second Am. Compl. ¶¶ 109, 132 ("The CIA Defendants adhered to this policy, pattern or practice when they conspired with and/or directed Julio Roberto Alpirez and/or others who intentionally and secretly imprisoned, tortured and/or extrajudicially executed Mr. Bamaca as part of their effort to obtain information sought by the CIA [D]efendants.").  Plaintiff has proffered no evidence that would lead this Court to believe that the former individual defendants and CIA agents at issue had any motive divorced from collecting intelligence and aiding the defeat of the Marxist Guatemalan resistance movement (and therefore advancing the policy of the United States at that time). *Id.* at 990 (excluding actions committed solely for the servant's own purposes from the scope of employment).

As such, the Court is faced with a situation where – based on the very allegations made in Plaintiff's Second Amended Complaint – the former individual defendants were clearly undertaking foreseeable conduct authorized by the CIA and other Executive Branch agencies or clearly incidental to such authorization.  The conduct was plainly intended, at least in part, to further the interests of the employer at issue – i.e., the United States.  Accordingly, the conduct at issue in Plaintiff's suit falls within the actors' "scope-of-employment," as set out in the Restatement

(Second) of Agency § 228.  With this conclusion, the Court is not sanctioning the alleged conduct at issue, torture, but determining who is to be held responsible for it – the employee individually or the United States.  Such a conclusion is consistent with similar determinations made by other courts within this jurisdiction.  *See, e.g.*, *Rasul*, 414 F. Supp. 2d at 30-39 (concluding that substitution of the United States for individual defendants pursuant to Westfall certification was proper, despite allegations that individual defendants – who were prison guards at Guatanamo Bay – tortured plaintiff detainees); *Schneider*, 310 F. Supp. 2d at 264-66 (concluding that the United States was properly substituted for individual defendant Henry Kissinger, despite allegations that he conspired to kidnap the Commander-in-Chief of the Chilean army, which led to his death); *Gonzalez-Vera v. Kissinger*, Civ. No. 02-2240, at 10-14 (HHK) (D.D.C. Sept. 17, 2004) (finding that United States was correctly substituted for individual defendant Henry Kissinger despite allegations that Kissinger assisted and condoned torture undertaken by the regime of General Augusto Pinochet), *aff'd on other grounds*, 449 F.3d 1260 (D.C. Cir. 2006).

Given that the actions undertaken by the former individual defendants named by Plaintiff fell within the scope of their employment, the Attorney General's March 31, 2000 Westfall certification was plainly appropriate.  Accordingly, as emphasized by the Government, the FTCA governs Plaintiff's suit.  *See* 28 U.S.C. § 2679(b)(1).  Because the underlying conduct at issue – i.e., the capture, torture, and extrajudicial killing of Bamaca, Plaintiff's husband – occurred exclusively within the borders of Guatemala, the "foreign country exception" applies.  *See* 28 U.S.C. § 2680(k).  Given the abrogation of *Sami* and the "headquarters doctrine," which might have saved Plaintiff's claims under the theory that the planning of the scheme took place within the United States, and the fact that the actions in Guatemala are most naturally understood as the kernel of a "claim arising in a foreign country," Plaintiff's suit is barred under the FTCA's "foreign country exception" to the

waiver of sovereign immunity.  *See Sosa*, 542 U.S. at 700-01, 711, 124 S.Ct. 2739.

>    B.    *Plaintiff's Attempt to Avoid the Immunity Created by the FTCA's "Foreign Country Exception" Through Resort to International Law and Other Statutes Such as the ATCA and TVPA Fails*

In an attempt to avoid the implications of the Westfall certification, the FTCA, and the

parameters of the "foreign country exception" as clarified in *Sosa*, Plaintiff looks to Count 28 of her

Second Amended Complaint, which contends that

>    [b]y participating and/or collaborating in the disappearance, prolonged arbitrary detention, torture, extrajudicial execution, and cruel, inhuman or degrading treatment of Mr. Bamaca, and/or conspiring or collaborating with and/or directing others who committed such acts, the CIA Defendants violated international law, including the law of war, the law of the United States, and the laws of the District of Columbia, Virginia, and Guatemala.

Pl.'s Second Am. Compl. ¶ 242; *see also* Pl.'s Submission of Detailed Stmt. re: Count 28 at 1-7.[5]

In addition to her emphasis on international law, Plaintiff specifically points to two statutes that she

claims are encompassed by Count 28 and are unaffected by *Sosa*:  (1) the ATCA, and (2) the

TVPA.  *See* Pl.'s Opp'n at 11-16.  Plaintiff contends that the existence of her ATCA and TVPA-

related claims against the individual defendants ensures that at least a portion of her suit remains

uncovered by the FTCA and therefore cannot be dismissed in full.  *Id.*  Upon a review, it is clear that

Plaintiff's attempted refuge against the individual defendants under international law, the ATCA,

and the TVPA is improper and without merit.

>    1.    <u>International Law</u>

First, Plaintiff – in Count 28 and in her Opposition – appears to invoke international law as

---

[5] Because the Court has concluded that sovereign immunity applies due to the fact that the individual defendants were acting within the scope of their employment, Plaintiff's effort in Count 28 to invoke the tort laws of the District of Columbia and Virginia must fail.  *See supra* Section III(A).

a basis to continue her suit against the former individual defendants and avoid Westfall certification

as it applies to Count 28.  Indeed, Plaintiff stresses in her Opposition that "the cause of action based

on clear and universal international customary law remains valid."  Pl.'s Opp'n at 13.  To the extent

that Plaintiff's reasoning can be read to suggest that Westfall Act substitution can be defeated on

grounds that violations of "clear and universal international customary law" somehow provide this

Court with "arising under" jurisdiction pursuant to 28 U.S.C. § 1331, Plaintiff's claim is misplaced.

Importantly, even if a federal employee is determined to have acted within the scope of his or

her employment, he or she is not immune from a money-damages suit if one of the two exceptions to

the Westfall Act applies.  Congress preserved a federal employee's individual liability for "a

violation of the Constitution of the United States," 28 U.S.C. § 2679(b)(2)(A), or "a violation of a

statute of the United States under which such action against an individual is otherwise authorized,"

*id*. § 2679(b)(2)(B).  International law, however characterized (i.e., the law of nations, federal

common law), falls outside of these clearly enumerated exceptions.  As such, an alleged violation of

international law cannot prevent a Westfall Act certification from applying.  *See Rasul*, 414 F.

Supp. 2d at 38; *Schneider*, 310 F. Supp. 2d at 267; *Gonzalez-Vera*, Civ. No. 02-2240 (HHK), at

14 n.13 (D.D.C. Sept. 17, 2004).  Indeed, the Supreme Court in *Sosa* specifically warned against

allowing private causes-of-action for violations of international law, emphasizing that courts should

consider "the potential implications for the foreign relations of the United States . . . [and be] wary of

impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs."

*Sosa*, 542 U.S. at 727, 124 S.Ct. 2739.  Moreover, Plaintiff cannot use 28 U.S.C. § 1331 as the

basis for a suit claiming a violation of international law, as Section 1331 merely confers federal

question jurisdiction, rather than creating any kind of cause-of-action for international law

violations.  *Id*.

26

2.     The Alien Tort Claims Act

As noted above, Plaintiff also contends that her "Alien Torts Claims Act claim" contained within Count 28 against the individually-named defendants in her Second Amended Complaint survives *Sosa* and its gloss on the FTCA's "foreign country exception."  According to Plaintiff, "it is clear that the *Sosa* case in no way negates Plaintiff's ATCA claim for violation of international law based upon the torture of her husband.  As there is no sovereign immunity to acts of torture, which are beyond the CIA's authority, there is no bar created by the *Sosa* ruling on the FTCA headquarters exception."  Pl.'s Opp'n at 13.  Based on these ATCA-related assertions, Plaintiff concludes that "the defendants' motion to dismiss this claim must fail."  *Id.*

The ATCA, in pertinent part, provides, "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the laws or nations or a treaty of the United States."  28 U.S.C. § 1350.  A plain reading of this statute in conjunction with its subsequent judicial interpretation reveals two key problems that undermine Plaintiff's attempted invocation of the ATCA to avoid Westfall certification, the application of the FTCA, and ultimately, dismissal.

First, "Plaintiff Jennifer Kristina Harbury is a United States citizen . . . and a resident of the District of Columbia."  Pl.'s Second Am. Compl. ¶ 9.  Plaintiff is not an "alien" and is therefore clearly unable to use the ATCA as the basis for *her* claims.  As noted previously, to the extent that her Second Amended Complaint stated claims on behalf of her husband in Counts 18-22 and 28 that could fall within the ATCA, Plaintiff appears to have conceded Westfall certification and the application of *Sosa* as to these claims.  *See supra* n.3 (citing Pl.'s Opp'n at 1 ("Plaintiff . . . urges that *her* claims for violations of intentional law . . . are not and cannot be barred by this ruling; and that *her* claim for infliction of emotional distress upon *her* survives as well") (emphasis added); Pl.'s

27

Surreply at 1 ("Plaintiff would show that the Defendants' responsive arguments regarding *her* international law claims and *her* claims for emotional distress must fail . . . .") (emphasis added)). Given that Plaintiff lacks standing to bring an ATCA claim and has apparently already conceded Westfall certification as to any of her husband's claims, Plaintiff's attempted invocation of the ATCA appears without foundation.

Second, even assuming *arguendo* that Plaintiff could invoke the ATCA on behalf of herself or her husband's estate, the ATCA would not fall within an exception to immunity under the Westfall Act.  Simply, the ATCA cannot be the subject of "a violation" of a federal statute because the ATCA provides no substantive rights that could be the subject of any claimed violation.  As the Supreme Court noted in *Sosa*, the ATCA is a "jurisdictional grant . . . best read as having been enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time" that the ATCA was enacted in 1789.  *Sosa*, 542 U.S. at 724, 124 S.Ct. 2739.  As the *Rasul* court correctly reasoned,

> [t]he plain language of the ATCA . . . does not confer rights nor does it impose obligations or duties that, if violated, would trigger the Westfall Act's statutory exception.  For the Westfall Act's statutory exception to apply, the ATCA would have to create substantive rights or duties that can be violated for the purposes of the Westfall Act.

*Rasul*, 414 F. Supp. 2d at 38 (citing *Schneider*, 310 F. Supp. 2d at 266 (noting that the ATCA cannot be violated for the purposes of § 2679(b)(2)(B)); *see also Gonzalez-Vera*, Civ. No. 02-2240 (HHK), at 15-16 (D.D.C. Sept. 17, 2004) (same).  Because the ATCA grants no rights to aliens, but simply provides the federal courts with jurisdiction to adjudicate rights conferred elsewhere, the ATCA fails to add Plaintiff in her attempt to satisfy the Westfall Act exception embodied in 28 U.S.C. § 2679(b)(2)(B).

3.     <u>The Torture Victim Protection Act</u>

Finally, Plaintiff seeks refuge from the exclusivity of the Westfall certification and the

substitution of the United States as the sole defendant by turning to the Torture Victim Protection

Act, which she claims would fall under the Section 2679(b)(2)(B) exception; indeed, Plaintiff

contends that her "claim under the Torture Victim Protection Act" is unaffected by *Sosa*. Pl.'s

Opp'n at 13. Plaintiff's TVPA argument is without merit for two reasons: (1) Plaintiff's claim is

untimely, and (2) even assuming *arguendo* that Plaintiff's claim was timely and did fall within the

parameters of her Second Amended Complaint, the TVPA would not have afforded Plaintiff a

cause-of-action in this case.

a.     *Plaintiff's New-Found TVPA Claim is Prejudicially Untimely*

Importantly, a review of Plaintiff's original Complaint, her First Amended Complaint, her

operative Second Amended Complaint, and her proposed/rejected Third Amended Complaint

(prepared four months after the Court ordered Plaintiff to clarify her international law claims as

intended to be asserted in Count 28) reveals one basic truth: nowhere does Plaintiff ever assert an

independent TVPA claim against the individually-named federal defendants. Indeed, the "TVPA"

itself is never explicitly mentioned. Faced with this truth, Plaintiff directs both the Court and

Defendant to look at her "Submission of a More Detailed Statement Regarding Count 28 of Her

Complaint" filed on April 19, 1999. *See* Pl.'s Surreply at 10. Plaintiff asserts, not that her April

19, 1999 submission was an incomplete description of her international law claims under Count 28,

but instead that the April 19, 1999 submission embodied a "full explanation" of those claims. *Id.*

She states that she "specifically discussed" in that submission "the TVPA claim in detail." *Id.*

A review of Plaintiff's April 19, 1999 submission, *see* Pl.'s Submission of Detailed Stmt. re:

Count 28 at 1-7, contains one – and only one – reference to the TVPA. On page 2, footnote 2 of the

document, Plaintiff in a "see also" citation references the TVPA in an attempt to define the meaning of "extrajudicial execution."  *See id.* at 2 n.2.  Nowhere else does Plaintiff cite the TVPA, claim that she or her husband's estate has a cause-of-action emanating from that statute, or otherwise attempt to make an argument based on its provisions.  Plaintiff has never sought to amend her Second Amended Complaint to include a claim based on a violation of the TVPA (even her proposed Third Amended Complaint was silent as to such a claim) – not even after she filed her Opposition brief as to Defendant's present motion.  As such, it is clear that Defendant, or the individually-named former federal defendants, never had any explicit notice that Plaintiff was asserting an independent TVPA-based claim.

Nor could such notice have been implied somehow from Plaintiff's vague and diffuse pleadings and/or previous arguments.  That is, when Plaintiff asserted that she was generally suing the individually-named defendants for violations of international law, or after her April 19, 1999 submission, the individual federal defendants would have had no notice or even a reasonable basis to believe that they were being sued for the violation of a federal statute entitled the TVPA.  Importantly, the TVPA is a *federal* statute, enacted in 1992 to amend the ATCA to provide civil liability for torture or extrajudicial killing carried out by an individual "under actual or apparent authority, or color of law, of any foreign nation."  TVPA § 2(a), Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 Note).  Plaintiff argues, without citation to any legal authority, that "the legislative history and contents of the [TVPA] make clear [that] the statute is very much based upon international law."  Pl.'s Surreply at 10.  However, a plaintiff suing an individual federal employee for violating a federal statute must place that defendant on notice as to the nature of the claim.  Plaintiff told these individually-named federal defendants that she was suing them, in pertinent part, under "international law."  Such a reference simply is not fair notice that she was

suing these defendants under a federal statute incorporating *foreign* law. The fact that Plaintiff herself may have considered the TVPA to be a source of *international* law does not suffice to have placed the individually-named defendants on notice that she was suing them for violation of that federal statute – i.e., the TVPA. Moreover, even assuming that *international* law formed the basis of some of the legislative history of the TVPA, that fact alone would provide insufficient notice: simply, a defendant is not required to understand the legislative history of every potential statute under which he or she could conceivably be sued; rather, it is the task of the plaintiff to specify what statutes and laws are the precise bases for his or her claims against a defendant, not the other way around. This would be true even if the TVPA actually incorporated *international* law (as claimed by Plaintiff), rather than *foreign* law, as the rule of decision.

Ultimately, Plaintiff cannot plead a claim for money damages against long-substituted, individually-named former federal defendants in an Opposition to a Motion to Dismiss filed eight (8) years after her original Complaint. Plaintiff has attempted to turn her Second Amended Complaint into a moving target, and unfairly so. Given that the individual federal defendants had no notice, or even a reasonable basis to believe, that they were being sued for a violation of the TVPA at any point in this lawsuit prior to Plaintiff's present Opposition, the Court finds that Plaintiff's attempted *sub rosa* amendment to her Second Amended Complaint Count 28 must fail. There has never been a TVPA claim pled in this case, and the Court shall not deem that one now exists. Given that Plaintiff's imposition of a TVPA-related argument is prejudicially untimely, such a claim should be rejected outright.

       b.     *The TVPA Would Not Afford Plaintiff a Cause-of-Action*

Even assuming *arguendo* that Plaintiff had properly set out and put the individually-named federal defendants on notice of a TVPA claim, such a claim would be subject to dismissal. Upon an

analysis of the merits of a TVPA-based argument in this case, two problems that undermine any TVPA claim that Plaintiff could set forth become immediately apparent.  First, Section 2(b) of the TVPA would act to bar Plaintiff's claim.  Section 2(b) provides:  "A court shall decline to hear a claim under this section if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred."  TVPA § 2(b).  Congress enacted this requirement to "ensure[] that U.S. courts will not intrude into cases more appropriately handled by courts where the alleged torture or killing occurred," under the theory that this requirement "will also avoid exposing U.S. courts to unnecessary burdens," and "to encourage the development of meaningful remedies in other countries."  *See* H.R. Rep. No. 102-367(I), at 5, *reprinted in* 1992 U.S.C.C.A.N. 84, 87-88.  Here, Plaintiff has neither alleged nor established that she has ever pursued and/or exhausted her remedies against her husband's alleged torturers in the place in which the conduct giving rise to the claim occurred – i.e., Guatemala.

Second, as noted above, the TVPA imposes civil liability only on an individual acting "under actual or apparent authority, or color of law, of any *foreign* nation."  TVPA § 2(a) (emphasis added).  At the time of the TVPA's signing, the "under foreign color of law" requirement was understood to serve as an important limitation of the Act that would preclude its application to United States operations abroad.  As President George H.W. Bush noted upon its March 16, 1992 signing:

> Finally, I must note that I am signing the bill based on my understanding that the Act does not permit suits for alleged human rights violations in the context of United States military operations abroad or law enforcement actions.  Because the Act permits suits based only on actions "under actual or apparent authority, or color of law, of any foreign nation," I do not believe it is the Congress' intent that [the TVPA] should apply to United States Armed Forces or law enforcement operations, which are always carried out under the authority of United States law.

Stmt. by Pres. George H.W. Bush Upon Signing H.R. 2092, 22 Weekly Comp. Pres. Doc. 465

(Mar. 16, 1992).  Indeed, President Bush further emphasized that "[t]his legislation concerns acts of torture and extrajudicial killing committed overseas by *foreign* individuals."  *Id.* (emphasis added). As President Bush recognized, a different reading of the law would expose every federal employee working abroad daily with employees of foreign governments – i.e. employees in intelligence agencies, military agencies, diplomatic and foreign aid agencies, and law enforcement agencies – to personal liability under the construct that they were somehow actually or apparently acting under foreign law.

Accordingly, the plain language of the TVPA limits liability to those acting under color of law of a foreign nation.  *See White v. Paulsen*, 997 F. Supp. 1380, 1385 n.1 (E.D. Wa. 1998) ("On its face, the right of action created by the Torture Victim Protection Act is limited to conduct taken under color of law of a 'foreign' nation.").  The legislative history refers to torture or extrajudicial killing committed by foreign actors rather than domestic ones.  *See, e.g.*, H.R. Rep. No. 102-367(I), at 3-4, *reprinted in* 1992 U.S.C.C.A.N. 84, 86 ("[T]he TVPA would extend a civil remedy also to U.S. citizens who may have been tortured abroad."); *id.* at 4, *reprinted in* 1992 U.S.C.C.A.N. 84, 87 ("[O]nly 'individuals,' not foreign states, can be sued under the bill."); *id.* at 5, *reprinted in* 1992 U.S.C.C.A.N. 84, 88 ("The TVPA is subject to the restrictions in the Foreign Sovereign Immunities Act of 1976.").

Here, to find that the individually-named federal defendants acted under color of foreign law, the Court would be required to conclude that these individuals, employed by the United States, acted as agents of the Guatemalan government while serving the CIA in its collection of intelligence "through human sources and by other appropriate means," 50 U.S.C. § 403-4a(d)(1); this would be "a far fetched proposition at best and, more importantly and significantly, one that was not alleged in [P]laintiff[']s complaint."  *Gonzalez-Vera*, Civ. No. 02-2240 (HHK), at 17 (D.D.C. Sept. 17,

2004).  As this Court discussed previously, *see supra* Section III(A), the alleged actions undertaken

by the individual CIA defendants were clearly within the scope of their employment serving the

United States.  These alleged actions taken by the individual CIA defendants carrying out the

policies and directives of the CIA to obtain intelligence for the United States' benefit were therefore

undertaken under color of United States law – not "under actual or apparent authority, or color of

law of any foreign nation."  Indeed, none of the allegations within the Second Amended Complaint

supports the existence of an agency relationship between the named individual defendants and

Guatemala.  *See* Restatement (Second) of Agency § 15 (1958) ("[o]ne becomes an agent only if

another in some way indicates to him consent that he may act on the other's account" and the agent

consents to the agency relationship).  Moreover, Plaintiff has failed to cite a single case that stands

for the principle that a U.S. agent serving the interests of the United States and acting within his or

her employment can be held liable pursuant to the TVPA.  Rather, all relevant decisions point to the

conclusion that such liability pursuant to the TVPA cannot attach to U.S. agents.  *See, e.g.*,

*Schneider*, 310 F. Supp. 2d at 267 ("In carrying out the direct orders of the President of the United

States, . . . Dr. Kissinger was most assuredly acting pursuant to U.S. law, if any, despite the fact that

his alleged foreign co-conspirators may have been acting under color of Chilean law."); *Gonzalez-

Vera*, Civ. No. 02-2240 (HHK), at 17-21 (D.D.C. Sept. 17, 2004) (same).

       Plaintiff attempts to avoid this quandary by analogizing to 42 U.S.C. § 1983, using its

"color of state law" test to argue that mere joint participation of Guatemalan military officials and

individual CIA defendants in their alleged effort to obtain intelligence from Bamaca would render

the individually-named federal defendants as acting under color of Guatemalan law.  *See* Pl.'s

Surreply at 12-14.  However, "Section 1983 does not apply to federal officials acting under color of

federal law."  *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1104 (D.C. Cir. 2005).  That is, if a

federal official acts pursuant to his or her federal authority, it is not deemed an act taken under color

of state law.  *See Williams v. United States*, 396 F.3d 412, 415 (D.C. Cir. 2005) (arrestee could not

bring Section 1983 action against an officer employed by the U.S. Government Printing Office

despite argument that D.C. officials conspired with the federal official because the officer was a

federal official, not a D.C. official; only the federal government gave him power to make arrests for

violations of D.C. law; the District of Columbia did not have authority over him and did not

"exercise . . . coercive power" through him; and D.C. officials had minimal involvement in the

incident); *see also Strickland v. Shalala*, 123 F.3d 863, 866 (6th Cir. 1997) ("Because federal

officials typically act under color of federal law, they are rarely subject to liability under § 1983.").

Even where courts have found that a federal official, acting under color of federal law, can

possibly be deemed to act under color of state law if he or she conspires or acts in concert with state

officials, *see Strickland*, 123 F.3d at 866 (collecting cases), these courts have generally held that

there is no "state action" under Section 1983 unless there has been a misuse of power "possessed by

virtue of state law and made possible only because the wrongdoer is clothed with the authority of

state law." *West v. Atkins*, 487 U.S. 42, 49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (quoting

*United States v. Classic*, 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941)).  Here, there is

no valid claim that the individually-named CIA defendants possessed authority by virtue of the laws

of Guatemala, or that they were somehow "clothed with the authority of" Guatemalan law despite

their employment by the United States.  Rather, the allegations of the Second Amended Complaint

demonstrate that these individual defendants were acting within the scope of their federal

employment pursuant to the National Security Act of 1947 to gather intelligence for the United

States.  At all times, these former defendants were "clothed with the authority" of federal law.  As

such, even leaving aside the clear intent of both Congress and President Bush at the time of the

TVPA's enactment, the basic, explicit limitations of the TVPA itself, and persuasive precedent arguing against applying the TVPA to officials of the United States, even an application of Section 1983-style reasoning would undermine Plaintiff's belated TVPA claim.  Accordingly, even assuming *arguendo* that Plaintiff's TVPA claim was not prejudicially untimely, Plaintiff's attempt to avoid *Sosa* and the strictures of the FTCA through the TVPA is without foundation.

> C.     *Plaintiff's Tort Claims to Recover for Her Own Personal Distress Based on Her Husband's Alleged Detention, Torture, and Execution in Guatemala are Entirely Derivative of Claims Arising in Guatemala and Must Be Dismissed*

As repeatedly noted above, Plaintiff's action is "most naturally understood as the kernel of a claim arising in a foreign country," *Sosa*, 542 U.S. at 701, 124 S.Ct. 2739 – i.e., Guatemala.  All of Plaintiff's counts that remained at the outset of Defendant's current Motion to Dismiss are based on injuries suffered by her husband in Guatemala.  *See, e.g.*, Counts 18-19 (based on the alleged "imprisonment, torture, and extrajudicial execution" of Bamaca in Guatemala); Count 20 (based on the false imprisonment of Bamaca in Guatemala); Count 21 (based on the assault and battery of Bamaca in Guatemala); Count 22 (based on the wrongful death of Bamaca in Guatemala); Count 28 (based on the alleged abusive treatment that Bamaca received in Guatemala).  Insofar as Plaintiff claims that she suffered emotional distress (Counts 18-19, 28), physical distress (Count 28), and the loss of spousal companionship (Count 28) in some unidentified state in the United States,[6] Plaintiff's personal claims are entirely derivative of claims "based on . . . injury suffered in a foreign country." *Sosa*, 542 U.S. at 701, 124 S.Ct. 2739.

---

[6] Plaintiff, in her Second Amended Complaint, alleges that she is a resident of the District of Columbia, *see* Pl.'s Second Am. Compl. ¶ 9, but in her Surreply notes that (1) she was a resident of the State of Texas "[a]t the time of her husband's capture in 1992 . . . and remained so for most of the time period he was still alive"; and (2) she became a resident of Massachusetts in 2003.  *See* Pl.'s Surreply at 15-16.

Importantly, the viability of such derivative claims are commensurate only with the viability of the primary claim. *See, e.g.*, *Thurman v. DaimlerChrysler, Inc.*, 397 F.3d 352, 359 (6th Cir. 2004) (loss of consortium claim "is derivative and thus stands or falls on the primary claims in the complaint") (citations and internal quotation marks omitted); *St. John v. Int'l Ass'n of Machinists Aerospace Workers, Local #1010, Dist. #118, Local Lodge No. 254*, 139 F.3d 1214, 1217 n.1 (8th Cir. 1998) (wife's "loss of consortium claim is derivative of her husband's claims and will not survive to the extent [the husband's] underlying claims are preempted"); *Murray v. Commercial Union Ins. Co.*, 782 F.2d 432, 438 (3d Cir. 1996) (same); *cf. Skees v. United States*, 107 F.3d 421, 426 (6th Cir. 1997) (*Feres* doctrine bars derivative suits even when local law gives heirs of the deceased an original action because their claims are entirely derivative of the serviceman's barred claim) (citing cases). Because all remaining claims in this lawsuit are based on injuries sustained by Bamaca in Guatemala, and no primary claim remains viable, as explained above, Plaintiff's derivative claims must be dismissed in their entirety pursuant to *Sosa*.[7]

D.   *Plaintiff Cannot Resurrect Her Moribund "Access to Courts" Claims and, Even Assuming Arguendo that She Could, Such Claims Would Be Subject to Dismissal*

Finally, in a last ditch effort to save at least some aspect of her case, Plaintiff requests that this Court allow her to resurrect her original claims for violation of her right to access to the courts. *See* Pl.'s Second Am. Compl. ¶¶ 166-171 (Count 14); ¶¶ 172-177 (Count 15). As noted previously, the Supreme Court in *Christopher v. Harbury* upheld this Court's dismissal of

---

[7] To the extent that Plaintiff, in her Surreply, raises the possibility that her derivative claims are somehow related to "the Defendants' ongoing false statements to her and to the United States Congress to the effect that Defendants possessed no information about her husband," *see* Pl.'s Surreply at 15, Plaintiff's ever-shifting argument is best characterized as a claim for misrepresentation barred against the sole, proper defendant in this case – the United States – under the misrepresentation exception to the FTCA. *See* 28 U.S.C. § 2680(h).

Plaintiff's "denial of access" claims, holding that Plaintiff had failed to identify the underlying cause-of-action that the individual defendants' deception had compromised and for which a remedy was not otherwise currently available. *See* 536 U.S. at 418-22, 122 S.Ct. 2179. Plaintiff takes this ruling to mean that "[s]hould all claims in this case be finally dismissed," she can resurrect this claim and specify precisely which underlying causes-of-action were compromised by any deception. *See* Pl.'s Opp'n at 20-21. Based on this interpretation, Plaintiff asks that she now be granted "leave to amend her complaint" to include allegations that had such deception not occurred, she could have brought a claim for injunctive relief while her husband was still alive against the CIA Defendants; according to Plaintiff, this claim would have been based upon the premise that these defendants, by engaging in torture in violation of the rules and regulations of their agency, had violated the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq. See* Pl.'s Opp'n at 21.

Two major problems undermine Plaintiff's attempted resurrection of her "denial of access" claims at this time. First, the Supreme Court's decision – which *dismissed* her "denial of access" claims – did not "guarantee" that Plaintiff had a right to reinstate her claims based on a constitutional right to access to the courts in the event that she were unsuccessful on all 28 counts of her Second Amended Complaint – i.e., the *third* iteration of the complaint in this action. By pointing out that Plaintiff might have possessed causes-of-action otherwise available to her (the very claims now subject to dismissal on this motion), the Court nowhere provided any guarantee that a failure to prevail on those causes-of-action would ensure an opportunity to reinstate her "denial of access" claims. Indeed, the availability of a claim does not guarantee victory on a claim – a fact that the Supreme Court certainly recognized. Moreover, the Supreme Court itself emphasized its displeasure with the opportunity taken by Plaintiff on appeal and at that late stage in the proceedings to "supply the missing allegations." *See* 536 U.S. at 419 n.17, 122 S.Ct. 2179. Based upon a

38

reading of the Supreme Court's decision, it appears that Plaintiff's attempted resurrection is without

foundation.

Second, and more importantly, even assuming *arguendo* that Plaintiff could resurrect her

"denial of access" claims based upon a theory that, absent any deception, she could have brought an

APA-based action for injunctive relief immediately following her husband's capture, such claims

would ultimately be futile.  Importantly, Plaintiff – before the D.C. Circuit and the Supreme Court –

did specify that the individual defendants' deception cost her the opportunity to have brought an

action for "the injunctive relief that might have saved her husband's life."  *Id.* at 419, 122 S.Ct.

2179.  The Supreme Court rejected Plaintiff's "injunctive relief" argument – the very argument she

now attempts to forward – in two ways.  First, the Court noted:

> It is true that she cannot obtain in any present tort action the order she would have
> sought before her husband's death, the order that might have saved her husband's
> life.  But neither can she obtain any such order on her access claim, which therefore
> cannot recompense Harbury for the unique loss she claims as a consequence of her
> inability to bring an intentional-infliction action earlier.

*Id.* at 421-422, 122 S.Ct. 2179.  It is for this reason – i.e., that Plaintiff's "available" relief under

Counts 18-19, 20-22, and 28 would provide her the same relief that any "denial of access" claim

would – that the Supreme Court dismissed Plaintiff's attempted "backward-looking action."  *See id.*

at 422, 122 S.Ct. 2179 ("And it is just because the access claim cannot address any injury she has

suffered in a way the presently surviving intentional-infliction claims cannot that Harbury is not

entitled to maintain the access claim as a substitute, backward-looking action.").

Second, the Supreme Court emphasized that Plaintiff's "denial of access" claim would likely

fail for other reasons as well.  *See id.* at 422 n.19, 122 S.Ct. 2179.  Footnote 19 of the Supreme

Court's Opinion focuses on the significant obstacles that Plaintiff would have been forced to

overcome had she been able to locate a remedy not otherwise currently available.  *See id.*  In

Footnote 19, the Supreme Court specifically noted one potential roadblock that is certainly relevant in the context of this motion to dismiss:

> And, of course, all of this assumes the unlikely case that the Government would not certify the defendants' action as exercises of their official capacity, or that if the Government did, an action could be maintained under the Federal Tort Claims Act.

*Id*. (citations omitted).  As discussed throughout this Opinion, the Government did enter a Westfall Certification, the FTCA does apply to Plaintiff's suit, and – pursuant to *Sosa* – Plaintiff's claims are now barred.  Accordingly, even if the Supreme Court's Opinion could be read to allow Plaintiff to resurrect her "denial of access" claims contained within Counts 14 and 15, Plaintiff's present formulation of the "claims lost" following any deception (1) has already been rejected by the Supreme Court, and (2) would also have to be rejected for the reasons expressed above in this Opinion.  As such, the Court rejects Plaintiff's attempted reformulation of her "denial of access" claims at this time, and notes that dismissal of all remaining counts is both complete and final.

## IV: CONCLUSION

For the reasons set forth above, the Court shall grant Defendant's Motion to Dismiss and shall dismiss all counts remaining in Plaintiff's action for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).  An appropriate Order accompanies this Memorandum Opinion.


Date:   August 1, 2006


_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge